FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
In re:

LEHMAN BROTHERS HOLDINGS INC., et al.,

               Debtors.
-------------------------------------------------------------------------X
MICHIGAN STATE HOUSING DEVELOPMENT
AUTHORITY, a public body corporate,

               Plaintiff/Counterclaim Defendant,

                   v.

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.
and LEHMAN BROTHERS HOLDINGS INC.,

               Defendants,

                - and -

LEHMAN BROTHERS SPECIAL FINANCING INC.

               Defendant/Counterclaim Plaintiff.
-------------------------------------------------------------------------X

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

Adv. No. 09-01728 (JMP)


**MEMORANDUM DECISION GRANTING MICHIGAN STATE HOUSING**
**DEVELOPMENT AUTHORITY'S PARTIAL MOTION FOR SUMMARY JUDGMENT**


WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Debtors*
767 Fifth Avenue
New York, NY 10153

      Richard W. Slack, Esq.


WILMER CUTLER PICKERING HALE & DORR LLP
*Attorneys for the Michigan State Housing Development Authority*
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

Craig Goldblatt, Esq.
Daniella Spinelli, Esq.


STATE OF MICHIGAN – STATE OPERATIONS DIVISION
*Attorney for the Michigan State Housing Development Authority*
22nd Floor G. Mennen Williams Building
525 West Ottawa Street
Lansing, MI 48909

Jennifer M. Jackson, Esq.


JAMES M. PECK
United States Bankruptcy Judge


### *Introduction*

Lehman in its heyday structured and engaged in a dizzying array of sophisticated

financial transactions using swaps, repos and other qualified financial contracts. As a

consequence of that vast and varied prepetition activity in the derivatives markets, these

bankruptcy cases have turned out to be a proving ground for interpreting, applying and testing

the boundaries of the safe harbor provisions of the United States Bankruptcy Code (the

"Bankruptcy Code").  The questions presented typically have involved financial contracts that

qualify for special treatment under these sections of the Bankruptcy Code in which a Lehman

affiliate – very often Lehman Brothers Special Financing Inc. ("LBSF") – has filed for

bankruptcy relief, thereby defaulting under terms of an ISDA master agreement.

This decision is the latest to consider the scope of the safe harbor for liquidating,

terminating and accelerating swap agreements.  In particular, the Court must consider what it

really means for a non-defaulting swap counterparty to have the unlimited contractual right to

2

liquidate a swap agreement and whether that protected right properly extends to the contractually prescribed procedures for calculating amounts due and owing from one counterparty to another. The question goes to the heart of this safe harbor: if the exercise of a contractual right to cause the liquidation of a swap agreement is protected, are the contractually specified means for conducting that liquidation so connected to the very concept of liquidation that they are also protected?

LBSF says no, arguing that the less favorable procedures triggered by a bankruptcy default are ineffective *ipso facto* alterations of a debtor's rights, and so do not fall within the safe harbor. Michigan State Housing Development Authority ("MSHDA") and the International Swaps and Derivatives Association, Inc. ("ISDA") (in an amicus brief) say yes, arguing that the protected right to liquidate cannot be viewed as an isolated right and necessarily includes those contractual provisions that provide needed guidance for liquidating and closing out the swap agreement. This dispute regarding scope is central to the meaning and purpose of this safe harbor.

The question is whether a contractual term calling for certain liquidation procedures in bankruptcy that are more favorable from the point of view of the non-defaulting party should be exempt from the rule that generally outlaws such *ipso facto* provisions. In this instance, there is economic significance to the answer because the specified liquidation methodology, if subject to the safe harbor protection for liquidating swap agreements, results in a reduction in the amount payable to LBSF as the defaulting counterparty. MSHDA closed out its swap years ago by following the liquidation protocol of the swap agreement and paying LBSF the amount that it calculated was due as a result of a bankruptcy default. LBSF contests that calculation and now

seeks to recover a substantial deficiency by referring to another method for liquidating collateral that otherwise would apply if its own bankruptcy filing were disregarded.

Analyzing these issues calls for consideration of the literal meaning of the word "liquidation" consistent with the purposes that underlie the safe harbor for liquidating swap agreements.  As explained in this decision, the Court has concluded that the protected right to liquidate must include a way to execute the liquidation in order to infuse the safe harbored right with meaning.  The concept of an unlimited right to liquidate a swap agreement is incomplete without reference to the methodology that the parties have chosen in their contract for conducting the liquidation.  That common sense construction of the safe harbor comports with the ordinary and customary meaning of the word "liquidate" (to liquidate is to convert an asset to cash by following a set of prescribed procedures) and allows the parties, without needless delay or uncertainty, to determine the amounts payable to terminate their swap agreement with clarity and finality.

This right of the non-defaulting party to rely upon contractual norms for disposing of collateral is an integrated aspect of what it means to cause the liquidation of a swap agreement and necessarily is protected by the language of Section 560 of the Bankruptcy Code.  To rule otherwise (in the manner urged by LBSF) would strip away the defining characteristics of a contractual right to liquidation that by statute may not be limited in any manner.  The non-defaulting party would be artificially relegated to the bare ability to cause a liquidation without reference to the related provisions of the swap agreement that enable counterparties to achieve a predictable, agreed resolution of their respective contractual obligations.

The approach advocated by LBSF would separate the right to liquidate from the designated contractual methods for carrying out the liquidation, safe harboring the first while

4

prohibiting the second.  Such a bifurcated construction would unduly restrict the meaning of the word "liquidation" as used in Section 560, thereby diminishing the effectiveness of this safe harbor in protecting the financial markets, promoting finality in the closing out of swap exposures and mitigating systemic risk.  The protected right to cause the liquidation of a swap agreement must extend beyond the mere capacity to commence a liquidation in a vacuum and must embrace those related terms of the swap agreement that explain the liquidation protocol to be followed when one party goes into bankruptcy.  These may be *ipso facto* provisions, but they are exempt by statute and permitted.

At an earlier stage in these bankruptcy cases, the Court decided that the safe harbor provisions of Section 560 of the Bankruptcy Code do not extend to a bargained for change in the priority of distributions between LBSF as swap counterparty and certain investors in notes issued by a special purpose vehicle.  That dispute dealt with the issue of whether a so-called "flip clause" triggered by a bankruptcy default is an ineffective *ipso facto* provision.

The Court found that the language of Section 560 is expressly limited to the specified rights to cause the liquidation, termination or acceleration of a swap agreement and does not authorize non-defaulting parties to swap agreements to improve their standing in a waterfall and obtain higher priority distributions upon the occurrence of a bankruptcy default.  That conclusion reached in *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("BNY Trustee") was ratified and followed in *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. et al*. *(In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("Ballyrock").

The current dispute prompts renewed attention to the language of Section 560 and touches again on an *ipso facto* provision in a qualified financial contract that is a source of

economic harm to the debtor associated with the very act of filing for bankruptcy. Despite the superficial similarity of the issues, the earlier determinations made with respect to impermissible changes to distribution priorities are not controlling. Here the question is more nuanced and closer to the statutory core of Section 560, leading to an examination of whether the methodology for conducting an indisputably exempt liquidation is also exempt. This time the scheme of Section 560 – namely protection of the "safe harbored" right to cause a liquidation – is directly implicated in the analysis. And this is where the position of LBSF begins to crumble.

Notwithstanding the argument of LBSF that a liquidation methodology triggered by bankruptcy that generates a smaller termination payment for the defaulting party is comparable to a "flip clause," the Court concludes otherwise. There is a significant difference between the reordering of priorities within a hierarchy of distributions (an *ipso facto* contractual term that is not mentioned in Section 560) and selecting which method to use when disposing and valuing collateral in connection with liquidating a terminated swap agreement. The choice of an accepted and contractually specified method to liquidate, even if it produces a less desirable result from the point of view of the debtor, is consistent with full implementation of the exemption that is codified in Section 560. This provision of the swap agreement is a contractual right to cause the liquidation (i.e., to liquidate), and accordingly is squarely within the safe harbor, not outside of it.

Accordingly, and for the reasons stated in greater detail in this decision, the alternative approach to liquidation of collateral used by MSHDA is effective even though it is contained in an *ipso facto* provision because that alternative is protected by the safe harbor of Section 560 and, as a consequence, is not subject to Section 365(e)(1).

*Background*

**The Swap Transactions**

The underlying facts are largely undisputed.[1]  MSHDA and Lehman Brothers Derivative

Products Inc. (a subsidiary of LBHI) ("LBDP") entered into an ISDA master agreement (the

"Master Agreement"[2]) and accompanying schedule (the "Schedule"[3]) on May 10, 2000.

Lehman Facts, ¶ 2; MSHDA Facts, ¶ 5.[4]  From the date the parties entered into the Master

Agreement and Schedule through July 10, 2008, LBDP and MSHDA entered into twenty

interest-rate swap transactions.  MSHDA Facts, ¶ 6.[5]

The Master Agreement listed certain "Events of Default and Termination Events" that

would result in the termination of these swap transactions.  *See, e.g.*, Master Agreement, § 5;

Schedule, Part 1(g).  Upon the occurrence of an Event of Default or Termination Event, the non-

defaulting party had the right to designate an early termination date for outstanding transactions.

MSHDA Facts, ¶ 10.  Pursuant to the Master Agreement and Schedule, the parties would then

calculate the amounts owed under the outstanding transactions using an agreed upon

methodology; here, the parties selected "Market Quotation" and the "Second Method" to

calculate amounts owed (the "Settlement Amount").  MSHDA Facts, ¶ 10; Master Agreement, §

6(e); Schedule, Part 1(f).  Second Method simply refers to a process in which the "out of money"

party pays the "in the money" party regardless of which party has defaulted.  Market Quotation

---

[1] Pursuant to Rule 7056-1 of the Local Bankruptcy Rules For The Southern District of New York, both MSHDA on the one hand and Lehman Brothers Holdings Inc. ("LBHI") and LBSF on the other hand filed separate statements of undisputed facts.  *See* ECF Nos. 31 and 37.   Reference to the MSHDA statement of undisputed facts will be cited as "MSHDA Facts, ¶ __" and reference to the Lehman statement of undisputed facts will be cited as "Lehman Facts, ¶ __."

[2] Motion (defined below) Ex. 2.

[3] Motion Ex. 3.

[4] Although LBSF (another subsidiary of LBHI) was LBHI's primary domestic derivatives trading entity, LBDP was a trading entity with a triple-A credit rating created to transact with counterparties that required a higher credit rating.  Lehman Facts, ¶¶ 2-4.

[5] Each of the twenty swap transactions were also subject to transaction specific confirmations with provided additional terms for each transaction.  *Id.*

is the method for calculating the Settlement Amount on the basis of quotations from "Reference Market-makers[6]." Master Agreement, § 12.

In addition to the "Events of Default and Termination Events" listed in the Master Agreement, the Schedule included certain "Trigger Events" which constituted additional termination events. Schedule, Part 1(g). Importantly, Part 1(g)(ii)(3) of the Schedule contemplated that the bankruptcy of LBHI – LBDP's parent – was a Trigger Event. Schedule, Part 1(g)(ii)(3). Moreover, termination as a result of a Trigger Event altered the methodology by which the non-defaulting party would calculate the amounts owed. Instead of the Market Quotation method contemplated under the Master Agreement, the Schedule provided that the Settlement Amount would be calculated using the "Mid-Market" method for termination caused by a Trigger Event. MSHDA Facts, ¶ 13; Schedule, Part 1(i)(2). Under the Mid-Market method, the Settlement Amount is calculated by "using Market Rates and Volatilities[7] and by polling the Dealer Group[8] as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date." Schedule, Part 1(i)(2).

---

[6] Reference Market-makers is defined in the Master Agreement as "four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city." Master Agreement, § 12.

[7] Market Rates and Volatilities is defined as, "in the case of interest rates and volatilities, the interest rates and volatilities obtained from the Telerate and Reuters screens where practicable and from polling the Dealer Group and, in the case of foreign exchange rates and volatilities and other pricing parameters, the foreign exchange rates and volatilities and other pricing parameters obtained from polling the Dealer Group. In each case, for all rates, volatilities or other parameters obtained, at least five members of the Dealer Group shall be polled, the highest and lowest of such returns (including, in the case of interest rates and volatilities, the rates and volatilities obtained from the Telerate and Reuters screens, if any) shall be discarded and the simple mathematical average of the remaining values shall be used to perform the applicable determination." Schedule, Part 1(j).

[8] Dealer Group is defined as "the following entities and such other entities as may be selected by [LBDP] from time to time: J.P. Morgan, Citibank, N.A., Barclays Bank PLC, Bankers Trust Company, Merrill Lynch Capital Services, Inc., The Chase Manhattan Bank, Deutsche Bank, National Westminster Bank PLC, Banque Nationale de Paris, Hong Kong and Shanghai Bank, the Sumitomo Bank Ltd., Bank of Tokyo-Mitsubishi Bank Limited, Westpac Bank Corp., Goldman, Sachs & Co. and Banque Paribas." Schedule, Part 1(j).

On September 15, 2008, LBHI filed for relief under chapter 11 of the Bankruptcy Code, and this was a Trigger Event in the Schedule. MSHDA Facts, ¶ 14. However, rather than terminating the outstanding transactions in accordance with the applicable provisions of the Schedule, LBDP and MSHDA entered into an assignment and amendment agreement, dated September 16, 2008 (the "Assignment Agreement"[9]), with LBSF – at the time, a non-debtor – in which all of LBDP's rights and obligations under the Master Agreement and Schedule with respect to outstanding transactions were assigned to LBSF. Lehman Facts, ¶ 13. The Assignment Agreement also amended the method used to calculate the Settlement Amount upon termination of the transactions. Specifically, paragraph 2 of the Assignment Agreement (the "Liquidation Paragraph") provided as follows:

> Upon the termination of the [Master Agreement and Schedule], as assigned and amended pursuant to the terms hereof, and notwithstanding any other provision hereof or thereof, any Settlement Amount payable by [MSHDA] shall be determined by LBSF pursuant to Part 1(i)(2) of the Schedule [(Mid-Market method)] . . . unless an Event of Default described in Section 5(a)(i) [(non-payment)] or Section 5(a)(vii) [(bankruptcy)] of the [Master Agreement] has occurred with respect to LBSF as the Defaulting Party, in which event the Settlement Amount shall be determined pursuant to Section 6 of the Agreement [(Market Quotation method)] as if LBSF is the Defaulting Party.

Assignment Agreement, ¶ 2. In essence, the Liquidation Paragraph provided that calculation of the Settlement Amount would be performed using the Mid-Market method, unless termination were due to the non-payment or bankruptcy of LBSF, in which case the Market Quotation method would be used. *Id.*

---

[9] Motion Ex. 5.

On October 3, 2008, LBSF commenced its own chapter 11 case.[10]  MSHDA subsequently

sent a letter to LBSF on November 5, 2008 declaring an Event of Default under the Master

Agreement and specifying November 5, 2008 as the early termination date.  MSHDA Facts, ¶

21.  In accordance with the terms of the Assignment Agreement (and the Liquidation Paragraph

in particular) MSHDA determined that it owed $36,346,426 to LBSF on account of the

terminated transactions and paid that amount to LBSF.  Lehman Facts, ¶¶ 18-19.  LBSF alleges

that had MSHDA calculated the Settlement Amount under the Mid-Market method instead of the

Market Quotation method, the amount owed by MSHDA would total $59,401,019 –

approximately $23 million more than the amount paid.  Lehman Facts, ¶¶ 17, 20.  Thus, this

dispute is all about the method – Mid-Market or Market Quotation – that properly should be used

in calculating the Settlement Amount.


**Procedural History**

On November 16, 2009, MSHDA filed this adversary proceeding against LBHI, LBSF,

and LBDP to recover approximately $2.4 million in funds transferred from MSHDA's bond

trustee to LBDP.  *See* Adversary Compl., Nov. 16, 2009, Adversary Proceeding ECF No. 1.  The

Lehman defendants answered the complaint on January 13, 2010 and asserted counterclaims

against MSHDA alleging breach of contract and unjust enrichment as a result of MSHDA's

improper valuation of the Settlement Amount under the Master Agreement and Schedule.  *See*

Answer and Affirmative Defenses of the Defs. and Countercl. of LBSF, Jan. 13, 2010, Adversary

Proceeding ECF No. 8.  MSHDA filed its answer to LBSF's counterclaims on January 22, 2010.

*See* MSHDA's Answer and Affirmative Defenses to Countercl., Jan. 22, 2010, Adversary

---

[10] For purposes of this decision, the Court is not assigning legal significance to the fact that the Liquidation
Paragraph was crafted after LBHI's chapter 11 filing at a time when the likelihood of LBSF's filing was greater and
perhaps even expected.

Proceeding ECF No. 10.  The parties then engaged in mediation pursuant to a previously

approved mediation protocol for resolving derivative disputes in the Lehman cases.  *See*

Stipulations and Orders Staying Adversary Proceeding, March 12, 2010 and June 17, 2010,

Adversary Proceeding ECF Nos. 11 and 12.  The mediation failed to resolve the dispute.

Thereafter, LBSF sought leave to amend its counterclaim to assert that the Liquidation

Paragraph should be invalidated as an impermissible *ipso facto* clause under the Bankruptcy

Code.  With leave of Court, LBSF filed its amended counterclaim on January 18, 2011

[Adversary Proceeding ECF No. 18] and MSHDA filed its answer to LBSF's amended

counterclaim on January 31, 2011 [Adversary Proceeding ECF No. 20].  MSHDA then moved to

withdraw the reference.  *See* MSHDA's Mot. to Withdraw the Reference, May 17, 2011,

Adversary Proceeding ECF No. 23.  The District Court denied MSHDA's request by order dated

September 14, 2011 [Adversary Proceeding ECF No. 26].

MSHDA filed its motion for partial summary judgment premised on the theory that the

Liquidation Paragraph, although an *ipso facto* provision, is protected under the safe harbor of

Section 560 of the Bankruptcy Code exempting contractual rights to liquidate, terminate, or

accelerate a swap agreement.  *See* MSHDA's Partial Mot. for Summ. J., March 27, 2012,

Adversary Proceeding ECF No. 31 (the "Motion").  MSHDA submits that the Liquidation

Paragraph fits squarely within the plain language of Section 560.  MSHDA also attempts to

distinguish this Court's prior decision in *BNY Trustee*, which held that a provision subordinating

Lehman's rights to certain collateral upon a bankruptcy filing did not meet the requirements of

Section 560 and was thus an unenforceable *ipso facto* clause, and argues that the Liquidation

Paragraph is different because it deals directly with a subject matter addressed by Section 560.

*BNY Trustee*, 422 B.R. at 421.

LBSF opposed the Motion and cross-moved for partial summary judgment on June 8, 2012. *See* LBSF's Cross-Mot. for Partial Summ. J., June 8, 2012, Adversary Proceeding ECF No. 34. LBSF argues that the Liquidation Paragraph is a classic *ipso facto* clause under Sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code. According to LBSF, the safe harbor provided by Section 560 is limited and the Liquidation Paragraph is ancillary to the rights specifically enumerated in the statute.[11]

ISDA, as a non-party *amicus curiae*, filed a brief in support of the Motion on August 20, 2012. Br. of *Amicus Curiae* ISDA, Aug. 20, 2012, Adversary Proceeding ECF No. 44. Agreeing with MSHDA, ISDA argues that a liquidation methodology is precisely within the safe harbor provided by Section 560 and that such contractually specified procedures are important to market stability.

MSHDA replied in further support of the Motion and opposed LBSF's cross-motion on August 21, 2012 [Adversary Proceeding ECF No. 45], and LBSF replied in further support of its cross-motion on October 24, 2012 [Adversary Proceeding ECF No. 51].[12]

A hearing on the Motion took place on September 18, 2013[13], and the Court took this matter under advisement.[14]

### *Standard*

Summary judgment is appropriate when there is "no genuine dispute as to any material fact," and the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a);

---

[11] The Official Committee of Unsecured Creditors of LBHI (the "Lehman Committee") filed a joinder to LBSF's cross-motion and opposition to the Motion. Adversary Proceeding ECF No. 39.

[12] The Lehman Committee filed a joinder to LBSF's reply on the same day [Adversary Proceeding ECF No. 52].

[13] Between the conclusion of summary judgment briefing and the hearing, the parties again, in compliance with a recommendation by the Court at a March 21, 2012 status conference, attempted to mediate the matter. The second mediation also was unsuccessful. These attempts to resolve this dispute by agreement account for the long delay between briefing and argument.

[14] Transcript of hearing available at Adversary Proceeding ECF No. 57.

*see NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Redd v. Wright*, 597 F.3d 532, 535-36 (2d Cir. 2010)).  The Court must view the facts in favor of the non-moving party and resolve ambiguities and draw inferences against the moving party.  *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008) (citing *Liberty Lobby*, 477 U.S. at 255; *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)).  In determining whether to grant a motion for summary judgment, the Court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Liberty Lobby*, 477 U.S. at 249 (internal quotation marks omitted)).  The facts with respect to this dispute, for the most part, are undisputed, and the Court discusses in the following section the applicability of Section 560 to the Liquidation Paragraph as a matter of law.[15]

### Discussion

The question before the Court is a subtle one and involves a parsing of the language and purpose of Section 560.  Before delving into the exercise and in order to provide needed context, it is necessary to examine those provisions of the Bankruptcy Code – Sections 365(e)(1) and 541(c)(1) – that invalidate so called *ipso facto* contractual provisions.

---

[15] MSHDA's Motion and LBSF's cross-motion also included arguments regarding summary judgment on breach of contract and unjust enrichment claims.  During the hearing, counsel for LBSF argued that summary judgment with respect to those issues was not appropriate as LBSF has not been afforded an opportunity to conduct discovery on those claims.  Motion Hr'g Tr. 93:15-94:17, Sept. 18, 2013.  Counsel for MSHDA responded that the main issue that it would like the Court to resolve is the scope of Section 560, after which the parties may be able to work through the remaining issues themselves.  *Id.* at 113:8-114:2.  This opinion is limited to the application of Section 560 to relevant provisions of the swap agreement.

**Bankruptcy Code's Anti-*Ipso Facto* Provisions**

Section 365(e)(1) of the Bankruptcy Code renders unenforceable those provisions that purport to terminate or modify a contractual term when a party files for bankruptcy and provides that:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on – (A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).  Similarly, Section 541(c)(1) of the Bankruptcy Code protects the interest of the estate in the debtor's property.  *See* 11 U.S.C. § 541(c)(1).  "It is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable."  *BNY Trustee*, 422 B.R. at 415 (citation omitted); *see also Ballyrock*, 452 B.R. at 39 (citation omitted).

Plainly, the Liquidation Paragraph is an *ipso facto* clause and provides that the bankruptcy of LBSF is an event which determines the choice of the method to be used in calculating the Settlement Amount in bankruptcy – here, the Market Quotation method.  The Court next considers whether, despite its *ipso facto* characteristics, the Liquidation Paragraph fits within the exemption of Section 560.

**The Liquidation Paragraph is Covered by the Section 560 Safe Harbor**

A swap agreement is a financial contract that qualifies for the exception to the *ipso facto* rule.  As defined by the Court of Appeals for the Ninth Circuit in *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, a swap is defined as

> . . . a contract between two parties . . . to exchange ("swap") cash
> flows at specified intervals, calculated by reference to an index.
> Parties can swap payments based on a number of indices including
> interest rates, currency rates and security or commodity prices.

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003).

Congress has enacted exceptions to the general rule disallowing *ipso facto* clauses for

swaps and certain other types of financial contracts to address volatility in the financial markets

which "can change significantly in a matter of days, or even hours. . . ." H.R. Rep. No. 101-484,

at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224. "[A] non-bankrupt party to ongoing

securities and other financial transactions could face heavy losses unless the transactions are

resolved promptly and with finality." *Id.*

The safe harbor for swap transactions is codified in Section 560 of the Bankruptcy Code

and provides in pertinent part:

> **Contractual right to liquidate terminate, or accelerate a swap
> agreement:** The **exercise of any contractual right** of any swap
> participant or financial participant **to cause the liquidation**,
> termination, or acceleration **of one or more swap agreements**
> because of a condition of the kind specified in section 365(e)(1) of
> this title or to offset or net out any termination values or payment
> amounts arising under or in connection with the termination,
> liquidation, or acceleration of one or more swap agreements **shall
> not be stayed, avoided, or otherwise limited by operation of
> any provision of this title** or by order of a court or administrative
> agency in any proceeding under this title. . . .

11 U.S.C. § 560 (emphasis added).[16]

"It is well established that when the statute's language is plain, the sole function of the

courts . . . is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534

(2004) (internal citations and quotation marks omitted). A court "must interpret a statute as it is,

---

[16] Section 560 was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to include
protection for the contractual right to cause the "liquidation" and "acceleration" of one or more swap agreements in
addition to the previously protected right to cause the "termination" of swap agreements.

not as it might be, since "courts must presume that a legislature says in a statute what it means and means in a statute what it says."" *Life Receivables Trust v. Syndicate 102 at Lloyd's of London*, 549 F.3d 210, 216 (2d Cir. 2008) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  If possible, a Court reviewing a statute must give effect to every clause and word of a statute.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (citations omitted).

Looking at the plain language of Section 560, the methodology set forth in the Liquidation Paragraph naturally fits within this safe harbor.  It is undisputed that MSHDA is a swap participant and that the Master Agreement and Schedule, as amended by the Assignment Agreement, constitute a swap agreement.  Going to the substance of Section 560, the statute protects the "exercise of any contractual right . . . to cause the liquidation . . . ."  11 U.S.C. § 560.

The word "liquidation," in the context of Section 560 means, according to the dictionary definition, the act of determining by agreement the exact amount of something that otherwise would be uncertain.[17]  The Court may refer to the common meaning and ordinary usage of undefined terms in a statute.  *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.")  Referring to the ordinary meaning of "liquidation" leads to the conclusion that the right to cause the liquidation of a swap agreement must mean the right to determine the exact amount due and payable under the swap agreement.  The amount can only be fixed by following the liquidation methodology specified in the swap agreement.

Section 560 expressly exempts the "exercise of any contractual right" to liquidate.  11 U.S.C. § 560.  That contractual right, in this instance, is spelled out in the Liquidation Paragraph.

---

[17] The definition reads as follows: "1. The act of determining by agreement or by litigation the exact amount of something (as a debt or damages) that before was uncertain. 2. The act of settling a debt by payment or other satisfaction. 3. The act or process of converting assets into cash, esp. to settle debts." *Black's Law Dictionary* (9th ed. 2009).

That paragraph lays out the methods for calculating the Settlement Amount in the event of termination of the swap agreement, stating that the Market Quotation method is to be used if termination is caused by the bankruptcy of, or non-payment by, LBSF and that the Mid-Market method is to be followed in other circumstances.  That choice of the method is an essential part of being able to carry out the act of liquidation.  The method employed in the act of liquidation is what allows the non-defaulting party to determine the Settlement Amount.

Liquidation and the methodology for carrying out the liquidation are linked concepts: to liquidate is to obtain values prescribed by contract.  Using the Market Quotation method to calculate the Settlement Amount is a necessary part of the exercise by MSHDA of its "contractual right" to "cause the liquidation" of the swap agreement with LBSF.

LBSF urges the Court to adopt a much narrower reading of Section 560 and draws a distinction between the act of "termination, liquidation, or acceleration" and the method chosen for calculating a Settlement Amount.  According to LBSF, only the acts are safe harbored and other rights, such as how to calculate the amount due, are ancillary rights and are not protected.

LBSF's distorts and truncates the meaning of Section 560.  Its tightly constricted interpretation is unpersuasive for a number of reasons.  First, LBSF does not give enough weight to the phrase "the exercise of any contractual right" which connects with the phrase "to cause the liquidation, termination, or acceleration" in Section 560.  Read together, the act of liquidation, termination, or acceleration must be performed in accordance with a contractual provision in the swap agreement.  Here, the Liquidation Paragraph specifies what that right entails.  Unless the act of liquidation is performed in accordance with some agreed method, the right to liquidate is disconnected and loses all practical meaning.

Second, although LBSF vigorously opposes the use of the Market Quotation method to calculate damages, it fails to explain why a commercially acceptable method chosen by the parties themselves should not be respected or to demonstrate why it is appropriate to use the alternative Mid-Market method.  The methods produce different results, but both methods are contractually approved methods for valuing collateral.  The result – whether it produces more or less value for the debtor – should not be decisive in considering how to apply the safe harbor. The liquidation method, regardless of amounts realized, is fully "baked" into the very concept of what it means to liquidate.

Third, allowing a non-debtor counterparty to use the contractual method of liquidation promotes the systemic goals of the safe harbor – to provide stability and certainty to the markets upon the insolvency of a counterparty and to enable the parties themselves to liquidate collateral in a contractually prescribed manner.  The current litigation is an example of the delay, expense and uncertainty that results when there is doubt surrounding the enforceability of contractual terms.

**BNY Trustee, Ballyrock, and Calpine Do Not Mandate a Different Outcome**

LBSF relies heavily on the proposition that non-enumerated rights are merely ancillary to the safe harbored rights to liquidate, terminate, and accelerate.  LBSF cites to three decisions, all from this Court, and two of which are prior Lehman decisions – (i) *BNY Trustee*, (ii) *Ballyrock*, and (iii) *Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, 2009 WL 1578282, Adversary Proceeding No. 08-1251 (Bankr. S.D.N.Y. May 7, 2009).  These cases are all distinguishable.

In *BNY Trustee*, this Court held that a "flip-clause" which subordinated Lehman's rights to certain collateral upon Lehman's default was an unenforceable *ipso facto* clause and not protected by Section 560.  *BNY Trustee*, 422 B.R. at 421.  The Court provided two rationales for this holding: (i) the flip-clause arose out of a supplemental agreement which did not comprise part of the swap agreement, and (ii) the flip-clause fell outside of the safe harbor of Section 560 because it did not deal expressly with liquidation, termination, or acceleration.  *Id.*  Neither of these rationales is applicable here.  The Liquidation Paragraph of the Assignment Agreement is part of the swap agreement at issue.  LBSF does not argue to the contrary.  More importantly, the Liquidation Paragraph, unlike the flip-clause in *BNY Trustee*, deals directly with a safe harbored right – the liquidation of swap agreements.  The very act of liquidating and the method for doing so are tightly intertwined to the point that liquidation without a defining methodology is impossible to perform.  Simply put, to liquidate is to calculate the Settlement Amount under the terms of the swap agreement.

Similarly, in *Ballyrock*, the Court held that a contractual provision purporting to substantially lower Lehman's priority of payment within a payment waterfall was outside the protection of Section 560.  *Ballyrock*, 452 B.R. at 40.  As the Court observed:

> Such a mandated elimination of a substantive right to receive funds that existed prior to the bankruptcy of LHBI should not be entitled to any protection under safe harbor provisions that, by their express terms, are limited exclusively to preserving the right to liquidate, terminate and accelerate a qualifying financial contract.

*Id.  Ballyrock*, like *BNY Trustee*, is also distinguishable from the current dispute because it deals with a provision altering priority of payment and not a provision strictly dealing with liquidation, termination, or acceleration.

Finally, the *Calpine* court, in dealing with comparable protections for commodities and forward contracts (11 U.S.C. § 556), held that a clause requiring a defaulting party to provide a written explanation for disputing the non-defaulting party's calculation of a Settlement Amount within two days of receipt was not entitled to safe harbor protection. *Calpine*, 2009 WL 1578282, at *6-7. Unlike the Liquidation Paragraph, the provision in *Calpine* was merely "incidental or ancillary" to the rights protected by the safe harbors. *Id.*

"Incidental" and "ancillary" are descriptive words that can influence the characterization of an act as falling either inside or outside the protected zone of the safe harbors. They are words that tend to distance a particular act from that zone, and the greater the distance, the more attenuated the ability to claim any immunity from the *ipso facto* bar to enforceability. Here, the Settlement Amount can be determined only by utilizing one contractual methodology for determining value. These concepts (liquidation and liquidation methodology) are so closely connected to one another that they flow together and become virtually inseparable.

### Conclusion

Words in a statute are to be given their ordinary meaning. *Lamie*, 540 U.S. at 534 (citations omitted). When dealing with a swap agreement, the exercise by a swap participant (here MSHDA) of a contractual right to cause a liquidation of the swap agreement in question is a unified concept because the act of causing a liquidation calls for the collection of market data in a particular manner from specified sources to obtain pricing information. For that reason, the plain meaning of this safe harbor protects both the act of liquidating and the manner for carrying it out. The act of causing liquidation and the methodology converge to the point of being one and the same.

20

Accordingly, the procedures followed by MSHDA in determining the Settlement Amount are protected by the safe harbor of Section 560, and the Court grants MSHDA's Motion for Summary Judgment to the extent set forth in this decision.


SO ORDERED.



Dated: New York, New York
      December 19, 2013



/s/ James M. Peck
_____
Honorable James M. Peck
United States Bankruptcy Judge